[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
STATEMENT OF APPEAL
The plaintiff, Connecticut Resources Recovery Authority (CRRA), appeals to the superior court, pursuant to General Statutes § 8-8, from the action of the defendant, the Planning and Zoning Commission of the City of Torrington (PZ). On July 26, 1995, the PZ approved, with conditions, the defendant Torrington Land Associates, Inc.'s (TLA's) application for a special exception for its proposed solid waste transfer station and leaf composting facility.
BACKGROUND
On April 25, 1995, Torrington Land Associates, Inc. (TLA) filed a special exception application for a transfer station and leaf composting facility on its property in Torrington, Connecticut. (Return of Record [ROR], Item 1: TLA's Special Exception application filed on April 25, 1995.) Attached to the special exception application, TLA filed a memorandum entitled "Special Exception Application and Site Plan Application CT Page 5261-DDDDDDDD Submission, Leaf Composting and Transfer Station" (project summary), which provides a summary of TLA's proposed facility and was prepared by Anchor Engineering Services, Inc. of East Hartford, Connecticut. (ROR, Item 1.) With its application for a special exception TLA also filed a site plan application for the transfer station and leaf composting, facility on April 25, 1995. (ROR, Item 2: TLA's site plan application filed on April 25, 1995.)
On April 26, 1995, the PZ accepted TLA's special exception application and set a public hearing date for June 14, 1995. (ROR, Item 3: Planning Zoning Commission minutes, dated April 26, 1995, p. 11.) On May 2, 1995, the PZ referred TLA's proposed facility to the Torrington Inland Wetlands Commission (IWC) for review. (ROR, Item 7: Planning Zoning Commission referral sheet to Inland-Wetlands Commission, dated May 2, 1995, with Inland Wetlands Commission comments dated May 15, 1995.) On May 15, 1995, the IWC responded that it had approved the wetland regulated portion of TLA's proposed facility. (ROR, Item 7.)
On June 1, 1995, the PZ published in the Torrington RegisterCitizen legal notice that, at a public hearing on June 14, 1995, it would hear TLA's application for a "Special Exception of the Zoning Regulations to allow Excavation and Material Processing per Use Code 13.00, Section 3.0, Table 1; Materials Transfer Station per Use Code 11.00, Section 3.0, Table 1, and Section 2.0; and Processing of Material Goods per Use Code 19.00, Section 3.0, Table 1." (ROR, Item 15: Legal notice published in RegisterCitizen.)
At the hearing on June 14, 1995, the PZ took evidence from numerous individuals. (ROR, Item 21: June 14, 1995 Planning 
Zoning Commission minutes, pp. 2-6.) On behalf of TLA, Mr. Mark Zessin of Anchor Engineering Services explained TLA's proposed facility. (ROR, Item 21.) Attorney Christine Giamalis appeared for CRRA. (ROR, Item 21.) Attorney Charles E. Roraback appeared on behalf of the Hillside Cemetery Association (Hillside) and spoke in opposition to TLA's proposed facility. (ROR, Item 21.)
At the end of the hearing, the PZ agreed to hold a special meeting on June 21, 1995 to walk TLA's proposed facility site, and to continue the hearing until June 28, 1995. (ROR, Item 21.) The parties also agreed to place the notice of public hearing sign for the next public hearing on the City of Torrington's property. (ROR, Item 21.) CT Page 5261-EEEEEEEE
Mark Zessin of Anchor Engineering Services then sent a letter, dated June 14, 1995, to Mr. Dan McGuinness, the City planner. (ROR, Item 17: Correspondence dated June 14, 1995 from Mark Zessin to Dan McGuinness.) In the letter, Zessin wrote that "[t]his [letter] is regarding our telephone conversation of this afternoon, during which you reiterated the opinion stated in your May 12, 1995 letter that a special exception under Use Code 13 (Excavation) is not required. As my June 7, 1995 letter and our previous discussions indicated the applicant [TLA] concurs with this opinion. As you have requested, clarification of this issue is needed, therefore, on behalf of Torrington Land Associates, Inc. we would like to clarify that the special use applied for is under Use Code 11 of your regulations (Junk Yards)." (ROR, Item 17.)
On June 21, 1995, the PZ met at the site of TLA's proposed facility. (ROR, Item 52: Minutes or special Planning Zoning meeting of June 21, 1995 regarding TLA site visit.) The PZ walked the site of TLA's proposed facility, and went to the Hillside Cemetery to evaluate the impact of TLA's proposed project on the cemetery. (ROR, Item 52.) Representatives of TLA, CRRA and Hillside attended the meeting. (ROR, Item 52.)
On June 28, 1995, the PZ held the continued public hearing on TLA's special exception application. (ROR, Item 28: Planning 
Zoning Commission minutes, pp. 2-7.) Attorney Peter Herbst represented TLA at the hearing. (ROR, Item 28.) Attorney Giamalis appeared representing CRRA, and Attorney Roraback appeared on behalf of Hillside. (ROR, Item 28.) At the end of the hearing, the PZ announced that it would continue the hearing until July 12, 1995. (ROR, Item 28.)
On July 12, 1995, the PZ held the continued hearing on TLA's special exception application. (ROR, Item 43: Planning Zoning Commission minutes of July 12, 1995 public hearing, pp. 5-9.) Attorney Herbst appeared on behalf of TLA, Attorney Douglas Cho appeared on behalf of CRRA, and Attorney Roraback appeared on behalf of Hillside. (ROR, Item 43.) At the end of the hearing, the PZ closed the public hearing on TLA's special exception application. (ROR, Item 43.)
On July 21, 1995, Mr. McGuinness sent a memorandum to the PZ regarding TLA's special exception application. (ROR, Item 44: Memo from Dan McGuinness to Planning Zoning Commission dated CT Page 5261-FFFFFFFF July 21, 1995.) In this memorandum, McGuinness addressed the plethora of issues that arose during the site visit and three public hearings, including the site, the type of facility, the noise, the buffers, the odor, the traffic, the blasting, the duration of construction, the procedural issues, the site plan issues, and the comments of other municipal departments. (ROR, Item 44.) He recommended that the PZ approve TLA's special exception application, subject to six conditions. (ROR, Item 44.)
Subsequently, on July 26, 1995, the PZ addressed McGuinness's recommendation that the PZ approve TLA's special exception application, subject to six conditions. (ROR, Item 46: Planning Zoning Commission minutes of July 26, 1995 meeting. pp. 6-7.) Ms. Pacheco of the PZ moved to approve TLA's special exception. (ROR, Item 46.) The PZ also incorporated, with some revision, McGuinness's six conditions. (ROR, Item 46.) The PZ then approved TLA's special exception application with conditions. (ROR, Item 47: Legal notice of Planning Zoning Commission Decision.)
On July 28, 1995, McGuinness sent a letter notifying TLA that on July 26, 1995, the PZ approved TLA's special exception application. (ROR, Item 48: Correspondence from Dan McGuinness to Michael Botticello dated July 28, 1995.) In the letter, McGuinness informed TLA that the PZ had approved TLA's special exception application, subject to the following conditions: "1. During construction of the facility, the applicant will cease all operations related to excavation — crushing, blasting, drilling, loading of trucks, etc. — one half hour before and one hour after a scheduled funeral or memorial service at the Hillside Cemetery. The applicant [TLA] will provide the Hillside Cemetery Association with the name and telephone number of a contact person who will be responsible for insuring compliance with this condition; 2. The applicant will place the crusher a minimum of 565 feet from the Hillside Cemetery property; 3. At least forty feet of the buffer along the Hillside Cemetery's property line is to remain in its natural state except for any clearing needed either to plant the required non-deciduous trees or install seismographic equipment to monitor blasting; 4. Prior to the start of any other work on the property, the applicant will a. install the required opaque fence and b. plant the non-deciduous trees in the buffer along Hillside Cemetery's property line. The trees are to be planted approximately forty-five feet from the Hillside Cemetery's property line; 5. The applicant will create a `split line' — i.e. an artificial crack in the rock — between the CT Page 5261-GGGGGGGG blasting sites and the Hillside Cemetery prior to beginning any other blasting on the site; 6. The applicant is not allowed to store or dismantle unregistered motor vehicles on the property." (ROR, Item 48.)
On August 10, 1995, CRRA commenced this appeal by service of process of the original Writ, Summons, Notice, Citation, Bond, and Appeal on Robert Botticello of TLA, Joseph L. Quartiero, City Town Clerk of Torrington, and John T. Hogan, Jr., Chairman of the PZ. (Return of Francis T. Ragonese, Deputy Sheriff of Hartford County, filed August 14, 1995.) CRRA appeals on the grounds that: (1) pursuant to § 8.3.2(A) or the City of Torrington's Zoning Regulations, TLA improperly posted the sign providing public notice or its special exception application; (2) TLA's proposed facility site constitutes a "flag lot" and as such, the PZ cannot approve it for industrial use through a special exception under the City of Torrington's Zoning Regulations (Zoning Regulations); (3) CRRA's traffic study and the testimony by its traffic expert shows that TLA's proposed facility violates Zoning Regulations § 8.2.2 because it will increase traffic volume and create a traffic hazard, which will hamper the City of Torrington's traffic circulation; and (4) TLA is not permitted, as a matter of right, under the Zoning Regulations to have a leaf composting facility in the Industrial Zone.
In response, on September 21, 1995, TLA filed its answer to CRRA's appeal. On October 3, 1995, the PZ filed its answer to CRRA's appeal, with the Return of Record.
On March 1, 1996, CRRA filed a brief in support of its appeal of the PZ's approval of TLA's special exception application. The PZ filed its brief on April 1, 1996, and on April 2, 1996, TLA filed its brief in support of the PZ's approval of TLA's special exception application. Additionally, CRRA filed a reply brief, dated April 12, 1996.
On April 8, 1996, the court, Walsh, J., held a hearing on this appeal.
JURISDICTION
General Statutes § 8-8 governs appeals from planning and zoning commissions. General Statutes § 8-8(b) provides, in relevant part, that "any person aggrieved by any decision of a board may take an appeal to the superior court for the judicial district in which the municipality is located." Id. CT Page 5261-HHHHHHHH
"A statutory right of appeal from a decision of an administrative agency may be taken advantage of only by strict compliance with the statutory provisions by which it is created. . . . Such provisions are mandatory and jurisdictional in nature, and, if not complied with the appeal is subject to dismissal." (Brackets omitted; internal quotation marks omitted.)Simko v. Zoning Board of Appeals, 206 Conn. 374, 377,538 A.2d 202 (1988). Aggrievement
"Pleading and proof of aggrievement are prerequisites to a trial court's jurisdiction over the subject matter of an administrative appeal. . . . It is therefore fundamental that, in order to have standing to bring an administrative appeal, a person must be aggrieved. . . ." (Brackets omitted; citations omitted; internal quotation marks omitted.) United CableTelevision Services Corp. v. Dept. of Public Utility Control,235 Conn. 334, 342, 663 A.2d 1011 (1995); see also Cole v. Planning Zoning Commission, 30 Conn. App. 511, 515, 620 A.2d 1324 (1993). "[A]ggrievement implicates the court's subject matter jurisdiction." Jolly, Inc. v. Zoning Board of Appeals, 237 Conn. 184,192, ___ A.2d ___ (1996). Further, aggrievement implicates the plaintiffs' standing to appeal, and represents the first issue the court must address. McNally v. Zoning Commission,225 Conn. 1, 5-6, 621 A.2d 279 (1993). The plaintiff "has the burden of proving aggrievement in the trial court." State Library v.Freedom of Information Commission, 41 Conn. App. 641, 648, ___ A.2d ___ (1996).
"Statutory aggrievement exists by legislative fiat, which grants appellants standing by virtue of a particular legislation, rather than by judicial analysis of the particular facts of the case." (Internal quotation marks omitted.) Cole v. Planning Zoning Commission, supra, 30 Conn. App. 514-15, 620 A.2d 1324
(1993). General Statutes § 8-8(a)(1) provides that an "[a]ggrieved person means a person aggrieved by a decision of a board and includes any officer, department, board or bureau of the municipality charged with enforcement of any order, requirement or decision of the board. In the case of a decision by a zoning commission, planning commission, combine planning and zoning commission or zoning board of appeals, aggrieved person includes any person owning land that abuts or is within a radius of one hundred feet of any portion of the land involved in the decision of the board." (Internal quotation marks omitted.) Id. CT Page 5261-IIIIIIII
The record reflects that the court, Walsh, J., held a hearing in the present appeal on April 8, 1996. At this hearing, CRRA, TLA and the PZ stipulated that CRRA is an abutting land owner of TLA's proposed solid waste and leaf composting facility. (Transcript of Superior Court hearing on April 8, 1996, p. 3) The court, Walsh, J., agreed to the parties' stipulation that CRRA is aggrieved by the PZ's granting TLA's special exception application for a solid waste transfer station and leaf composting facility. (Transcript of Superior Court hearing on April 8, 1996, p. 3) But see Farnsworth v. No. Branford ZBA,
Superior Court, judicial district of New Haven at New Haven, Docket No. 37 74 77 (February 22, 1996, Booth, J.) (stating that the "court recognizes that the parties may not stipulate to aggrievement and may not confer subject matter jurisdiction on the court. However, sufficient evidence was introduced at trial to show that the plaintiffs were and have continued to be the owners of the affected property and accordingly they are aggrieved).
The record contains CRRA's Certificate of Taking property from TLA. This document demonstrates that CRRA abuts TLA's property. (ROR, Item 42: Documents submitted at July 12, 1995 TLA public hearing in opposition to TLA's application.) Consequently, since CRRA provided proof of ownership and that it abuts TLA's property, at the hearing before the court, the court finds that CRRA is aggrieved, pursuant to General Statutes § 8-8(a)(1).
Timeliness of Appeal And Service of Process
General Statutes § 8-8(b) provides that an "appeal shall be commenced by service or process in accordance with subsections (e) and (f) of this section within fifteen days from the date that notice of the decision was published as required by the general statutes."
Section § 8-8(e) further provides that "[s]ervice of legal process for an appeal under this section shall be directed to a proper officer and shall be made by leaving a true and attested copy of the process with, or at the usual place of abode of, the chairman or clerk of the board, and by leaving a true and attested copy with the clerk of the municipality. Service on the chairman or clerk of the board and on the clerk of the municipality shall be for the purpose of providing legal notice of the appeal to the board and shall not thereby make the chairman or clerk of the board or the clerk of the municipality a CT Page 5261-JJJJJJJJ necessary party to the appeal."
The "failure to file a zoning appeal within the statutory time period deprives the trial court of jurisdiction over the appeal." Upjohn Co. v. Zoning Board of Appeals, 224 Conn. 96,102, 616 A.2d 793 (1992).
At its public hearing on July 26, 1995, the PZ approved TLA's special exception application with conditions.[1] (ROR, Item 47: Legal notice of Planning Zoning Commission regarding Planning Zoning Commission action on TLA's application.) Subsequently, on August 10, 1995, CRRA commenced this appeal by service of process of the original Writ, Summons, Notice, Citation, Bond, and Appeal on Robert Botticello of TLA, Joseph L. Quartiero, City Town Clerk of Torrington, and John T. Hogan, Jr., Chairman of the PZ. (Return of Francis T. Ragonese, Deputy Sheriff of Hartford County, filed August 14, 1995.) Therefore, CRRA commenced this appeal within fifteen days of the PZ's approval of TLA's special exception application.
General Statutes § 8-8(b) provides that a party must commence an appeal within fifteen days from the date that notice of the decision is published. Publication of the notice of decision occurs only after the board, such as the PZ, makes its decision. Therefore, because CRRA commenced this appeal within fifteen days of the PZ's approval of TLA's special exception application, the court finds that CRRA timely commenced this appeal.
SCOPE OF REVIEW
"It is well settled that courts are not to substitute their judgment for that of the board, and that the decisions of local boards will not be disturbed as long as honest judgment has been reasonably and fairly made after a full hearing . . . as the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . The court's function is to determine on the basis of the record whether substantial evidence has been presented to the board to support its findings. . . . Evidence is sufficient to sustain an agency finding if it affords a substantial basis of fact from which the act in issue can be reasonably inferred. . . . It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. . . . If CT Page 5261-KKKKKKKK even one of the reasons given by the board or its denial [or approval] is supported by substantial evidence, the board's decision must stand." Mobil Oil Corp. v. Zoning Board of Appeals,35 Conn. App. 204, 209-10, 644 A.2d 401 (1994); see alsoDeBeradinis v. Zoning Commission, 228 Conn. 187, 198-200,635 A.2d 1220 (1994); Keiser v. Conservation Commission, 41 Conn. App. 39,41-42, ___ A.2d ___ (1996).
"A board can find that substantial evidence exists if the record affords a substantial basis of fact for which the fact in issue reasonably can be inferred. . . . It is not the function of the reviewing court to weigh the evidence or to determine who is credible; that function is exclusively the board's." (Citations omitted.) Mobil Oil Corp. v. Zoning Board of Appeals, supra,35 Conn. App. 211-12.
Further, if a planning and zoning commission fails to state clearly the reasons for its decision, the trial court must search the record to find a basis for the commission's decision. DoubleI Limited Partnership v. Plan Zoning Commission, 218 Conn. 65,73, 588 A.2d 624 (1991).
DISCUSSION
Whether, pursuant to § 8.3.2(A) of the City of Torrington'sZoning Regulations, TLA properly Posted the Sign to ProvidePublic Notice of Its Special Exception Application.
CRRA argues that, pursuant to § 8.3.2(A) of the City of Torrington's Zoning Regulations (Zoning Regulations), TLA had to post a sign to provide public notice of its special exception application and its hearing date. CRRA argues that this sign did not conform with Zoning Regulations § 8.3.2(A) because the sign was neither posted in a conspicuous location, nor clearly legible from the street. Further, CRRA argues that TLA posted the sign such that tall grass and weeds obscured the bottom portion of the sign, which identified the time and date of the PZ's hearing on TLA's special exception application. Once CRRA's counsel noted the sign's defects to the PZ at the first public hearing, the PZ ordered TLA to post the sign on the City of Torrington's property, for better visibility.
In contrast, the PZ argues that, at the June 14, 1995 public hearing, both TLA and CRRA agreed to move the sign off TLA's proposed facility site, making the sign visible to the public. CT Page 5261-LLLLLLLL Further, the PZ maintains that CRRA's argument, that the second sign was defective after they had agreed to its location, is unconscionable. The PZ also argues that the weeds allegedly obscuring the posted sign were not on TLA's property, but rather were on CRRA's property, as TLA and CRRA are abutting landowners. Thus, the PZ argues that CRRA was responsible for the weeds and should not benefit from poor maintenance of its property. The PZ argues that it heard the evidence regarding the posting of the sign, and decided that the sign was proper under the Zoning Regulations.
TLA argues that the sign it posted did conform to the requirements of Zoning Regulations § 8.3.2(A) because TLA placed the sign on TLA's proposed facility site in a conspicuous location, visible from the access road to CRRA's transfer station. Further, TLA argues that it placed the sign so "it was visible from the most heavily traveled road in the vicinity of TLA's property." TLA acknowledges that, due to CRRA's inverse condemnation of part of TLA's property and the resulting nature of TLA's proposed facility site, TLA faced the dilemma of either not placing the sign on its property and not meeting the Zoning Regulations or putting the sign on its property and possibly placing it where people on Old Dump Road would not see it. Consequently, TLA argues that it did everything it could to assure that it posted the sign in accordance with the Zoning Regulations.
On April 8, 1996, CRRA filed a reply brief addressing the arguments raised in the PZ's and TLA's briefs. CRRA argues that the PZ must deny TLA's special exception application because TLA did not strictly comply with the requirements of Zoning Regulations § 8.3.2(A). Specifically, CRRA argues that both the PZ and TLA have conceded that the first sign was not posted near a street and therefore could not be legible from a street. Accordingly, CRRA argues that "[b]ecause the acts are undisputed that the sign did not comply with the requirement that it be legible from a street, under these circumstances the Commission erred by not denying the application as required by the regulation." (CRRA's Reply Brief, p. 2.) Further, CRRA argues that it did not waive its objection to the first sign's defect, but rather agreed not to raise future objections relating to the posting of a second sign on city owned property. Additionally, CRRA argues that TLA's inadequate placement of the first sign ailed to meet both the letter and the spirit of the Zoning Regulations. Therefore, CRRA argues that the PZ and TLA "should CT Page 5261-MMMMMMMM not be permitted to claim that because it may be difficult to comply strictly with the regulation, their conduct should be excused." (CRRA's Reply Brief, p. 7.)
General Statutes § 8-3c(b) provides, in relevant part, that the "zoning commission or combined planning and zoning-commission of any municipality shall hold a public hearing on an application or request for a special permit or special exception., as provided in section 8-2. . . . Notice of the time and place of such hearing shall be published in a newspaper having a substantial circulation in such municipality at least twice, at intervals of not less than two days, the first not more than fifteen days, nor less than ten days, and the last not less than two days before the date of such hearing."
In the present case, pursuant to General Statutes §8-3c(b), the PZ had published on May 31, 1995 and June 7, 1995 in the Register Citizen legal notice that, at a public hearing on June 14, 1995, it would hear TLA's application for a special exception to the Zoning Regulations. (Transcript from June 14, 1995 Public hearing, p. 3; ROR, Item 15: Legal notice published in Register Citizen regarding TLA public hearing.)
"The purpose of publishing notice to the general public . . . is to notify, `by means of legal advertisements, as much of the population as possible of contemplated zoning actions.'" Lauer v.Zoning Commission, supra, 220 Conn. 462; Delfino v. Planning Zoning Commission, 30 Conn. App. 454, 459, 620 A.2d 836 (1993). Further, the "reason for the requirement of notice is to advise all affected parties of their opportunity to be heard and to be apprised of the relief sought." (Internal quotation marks omitted.) Koepke v. Zoning Board of Appeals, 223 Conn. 171, 175,610 A.2d 1301 (1992).
"In addition to the statutory requirements for notice, municipalities, whether operating under the general statutes or a special act, may have additional public notice requirements, and failure to comply with them is also a jurisdictional defect." R. Fuller, `and Use Law and Practice § 466.1, p. 743 (1993); see also General Statutes § 8-2. "Such regulations are generally adopted by a municipality as a practical and necessary means of giving effective notice of the pending zoning application to as many affected, aggrieved and potentially aggrieved persons as possible." Wright v. Zoning Board of Appeals 174 Conn. 488, 491,391 A.2d 146 (1978). Local regulations are subject to the CT Page 5261-NNNNNNNN interpretation of the Commission, itself, and the court determines whether the Commission correctly interpreted its regulations and applied them with reasonable discretion to the facts. Shailer v. Planning Zoning Commission, 26 Conn. App. 17,22, 596 A.2d 1336 (1991).
Section 8.3.2 of the City of Torrington's Zoning Regulations provides, in relevant part, that "[i]n addition to the notification requirements in the Connecticut General Statutes, notice of all public hearings . . . shall be given in the following manner. . . . The applicant shall obtain from the Planning and Zoning Department a sign notifying the public of the hearing." Further, Zoning Regulations § 8.3.2. provides that "[t]he sign shall conform to the following requirements. a. The applicant shall post the sign in a conspicuous location on the lot affected by the application. b. The sign shall give information on the reason for the hearing (e.g. appeal, variance, of special exception), the time, date, and location of the public hearing and other information required by the City Planner. c. The sign shall be clearly legible from a street. d. The sign shall be posted at least 10 consecutive days before the public hearing. The sign shall not be removed until after the close of the public hearing. e. Failure to post and maintain the sign as required by this section shall be grounds for the denial of theapplication." (Emphasis added.)
CRRA appeals TLA's attempted compliance with Zoning Regulations § 8.3.2(A), especially subsections (a) and (c), for the PZ's June 14, 1995 public hearing. These subsections require, respectively, that the "applicant shall post the sign in a conspicuous location on the lot affected by the application," and the "sign shall be clearly legible from a street." Zoning Regulations § 8.3.2(A).
At the PZ's June 14, 1995 public hearing, Mark Zessin of Anchor Engineering Services, Inc., testified that because CRRA condemned all of TLA's property adjacent to the City of Torrington's streets, TLA could not comply with both Zoning Regulations § 8.3.2(A)(a) and (c) when it posted the sign notifying the public of the PZ's hearing. He testified that, as the person who placed the sign for TLA, he "was aced with the dilemma [of] either not putting the sign on the property and not meeting the regulation or putting the sign on the property and possibly putting it where people on Old Dump Road won't be able to see it." (Transcript of June 14, 1995 Public Hearing, p. 19.) CT Page 5261-OOOOOOOO Further, he testified that "there is no point on the property that is visible from a public street." (Transcript of June 14, 1995 Public Hearing, p. 19.)
Subsequently, at the end of the public hearing, the PZ stated that "if you want it [the sign] to be seen, then we will have to reach an agreement and the objection is not going to be at the next public hearing that it wasn't on their property. . . . I mean, if we want it someplace where the public can see, which is the whole intent of it, then we are agreeing that it would go to waive that it is on their own property and put it on the city property." (Transcript of June 14, 1995 Public Hearing, p. 70.) Consequently, the parties agreed to future sign posting on city property, and the PZ continued the public hearing on this matter to June 28, 1995. (Transcript of June 14, 1995 Public Hearing, pp. 70-71.)
On June 21, 1995, the PZ held a site visit of TLA's proposed facility and the Hillside Cemetery. (ROR, Item 52.) Subsequently, the PZ held public hearings on TLA's special exception application on June 28, 1995 and July 12, 1995. (ROR, Item 28; ROR, Item 43.) Prior to the June 28, 1995 hearing, the PZ had legal notice published in the Register Citizen on June 17, 1995, and on June 22, 1995. (Transcript of June 28, 1995 Public Hearing, p. 3; ROR, Item 24: Legal notice of Planning Zoning Commission regarding June 28, 1995 public hearing regarding TLA.) Prior to the July 12, 1995 hearing, the PZ had legal notice published in the Register Citizen on July 1, 1995, and on July 6, 1995. (Transcript of July 12, 1995 Public Hearing, p. 3; ROR, Item 33: Legal notice of Planning Zoning Commission regarding TLA public hearing on July 12, 1995.)
Although TLA did not comply with the plain language of Zoning Regulations § 8.3.2(A), TLA could not physically place the sign it received from the PZ in both a conspicuous location on its proposed facility site, and in such a place that it would be clearly legible from a street. Mark Zessin testified that, due to the nature of TLA's proposed facility site, TLA could not both post the sign in a conspicuous location on TLA's proposed facility site, and post the sign so it would be clearly legible from the street. Given this difficulty, the parties agreed at the June 14, 1995 public hearing to future sign posting on the city's property. Subsequently, the PZ held two more public hearings on TLA's special exception application. Prior to both of these hearings, the PZ had each legal notice published twice in the CT Page 5261-PPPPPPPPRegister Citizen.
In Wright v. Zoning Board of Appeals, supra, 174 Conn. 491, the sign posting requirement of § 17.2.3 of the New airfield zoning regulations[2] was not met; however, the plaintiff argued that notice pursuant to § 17.2.3 was unnecessary because statutory notice by publication, pursuant to the General Statutes, was sufficient. The court held that the "posting of a sign on the premises required by § 17.2.3 of the New Fairfield regulations is complementary to, and not in derogation of, the statutory notice. Such regulations are generally adopted by a municipality as a practical and necessary means of giving effective notice of the pending zoning application to as many affected, aggrieved and potentially aggrieved persons as possible. When such notice is required by a municipal ordinance duly adopted, compliance with that ordinance is required." Id.
Wright v. Zoning Board of Appeals, supra, is distinguishable from the present case. In Wright v. Zoning Board of Appeals,
supra, although the plaintiffs could have complied with § 17.2.3 and placed the red sign on their property, they failed to do so. In contrast, in the present case, given the noted problems with the location of TLA's proposed facility, TLA could not possibly have placed the public notice sign where it would have fulfilled the requirements of both Zoning Regulations §§ 8.3.2 (A)(a) and 8.3.2(A)(c). Therefore, "[c]ommon sense must be used in construing the regulation, and we assume that a rational and reasonable result was intended by the local legislative body." (Internal quotation marks omitted.) Lauer v. Zoning Commission,
supra, 220 Conn. 464.
"The fundamental reason for the requirement of notice is to advise all affected parties of their opportunity to be heard and to be apprised of he relief sought." Koepke v. Zoning Board ofAppeals, supra, 223 Conn. 175. Thus, the PZ's subsequent two public hearings on this matter, and its legal notices published in the Register Citizen prior to the public hearings, as well as the agreed to posting of the public hearing notice sign on the City of Torrington's property, notified as much of the general population as possible of the PZ's contemplated zoning actions, and advised the general public of their opportunity to be heard. Further, neither TLA's nor the PZ's actions frustrated constructive notice to the general public, regarding TLA's special exception application. Therefore, TLA fulfilled the mandate of General Statutes § 8-3c(b) and Zoning Regulations CT Page 5261-QQQQQQQQ § 8.3.2(A) to the fullest extent possible.
Accordingly, the court denies CRRA's appeal on this ground because, given the noted problems with the location of TLA's proposed facility, the PZ correctly interpreted their regulations concerning notice and applied them with reasonable discretion to the facts. See Double I Limited Partnership v.Planning Zoning Commission, 218 Conn. 65, 72, 588 A.2d 624
(1991), (holding that "[t]he trial court ha[s] to decide whether the board correctly interpreted the section of the regulations and applied it with reasonable discretion to the facts.").
Whether TLA's Proposed Facility Site Constitutes a "Flag Lot."
CRRA argues that TLA's proposed facility site constitutes a "flag lot." Therefore, CRRA argues that the PZ cannot approve it for industrial use through a special exception under the Zoning Regulations. According to CRRA, "the use of parcels of land which are categorized as `flag lots' is permitted solely and exclusively for residential purposes under Section 5.7 of the [Zoning] Regulations." Consequently, CRRA argues that because the TLA proposed facility site is a flag lot, TLA cannot use the site for its proposed facility. Thus, CRRA argues that TLA is not entitled to its special exception.
The PZ argues that "TLA's parcel is located in an industrial zone and is nonconforming because of its lack of frontage on a City accepted street. That does not mean that the parcel cannot be used or that it is a flag lot." Further, the PZ argues that the Zoning Regulations for a flag lot apply to residential areas only. Consequently, the PZ contends that it correctly decided that TLA's proposed facility site constitutes a valid building lot.
TLA argues that its proposed facility site is not a "flag lot" under the Zoning Regulations because its proposed facility site is located in the Industrial Zone and residential development is not proposed. TLA also argues that its proposed facility is consistent with the Zoning Regulations, which do not restrict the development of flag lots in the Industrial Zone.
On April 8, 1996, CRRA filed a reply brief addressing the arguments raised in the PZ's and TLA's briefs. CRRA argues that although the PZ as TLA addressed the "flag lot" issue, neither of these parties significantly addressed CRRA's argument that CT Page 5261-RRRRRRRR TLA's proposed facility site fails to meet the minimum street frontage requirement. CRRA maintains that TLA incorrectly argues the nonconforming use status of TLA's proposed facility site, regarding the minimum street frontage requirement. Further, CRRA argues that TLA's proposed facility represents a new, unapproved, expanded use of its property, and therefore does not qualify as a continuation of a nonconforming use.
A flag lot is defined in the Zoning Regulations § 2.2 as "a lot which has less than the minimum required lot width on aCity accepted street and which is accessed by an accessway," while a lot width is "the horizontal distance between side lot lines measured both at the minimum required front yard setback line and at the front lot line." (Emphasis added.) Zoning Regulations § 2.2. A street is "any vehicular thoroughfare which is: a. accepted by the City or State; or b. shown on a subdivision plan approved by the Planning and Zoning Commission as a private thoroughfare." Zoning Regulations § 2.2. Further, an accessway is "a strip of land fronting on a City accepted street that serves as the means of obtaining access to the usable portion of a flaglot. The accessway is part of the lot which it serves." Zoning Regulations § 2.2.
"The terms special permit and special exception have the same legal import and can be used interchangeably. . . . A special permit allows a property owner to use his property in a manner expressly permitted by the local zoning regulations. . . . The proposed use, however, must satisfy standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience, and property values. . . . Acting in this administrative capacity, the zoning commission's function is to determine whether the applicant's proposed use is expressly permitted under the regulations, and whether the standards set forth in the regulations and the statute are satisfied." (Brackets omitted; internal quotation marks omitted.) Whisper Wind Development Corporation v. Planning Zoning Commission, 32 Conn. App. 515, 520, 630 A.2d 108 (1993), aff'd, 229 Conn. 176, 640 A.2d 100 (1994).
"The basic rationale for the special permit . . . is that while certain land uses may be generally compatible with the uses permitted as of right in a particular zoning district, their nature is such that their precise location and mode of operation must be individually regulated because of the particular topography, traffic problems, neighboring uses, etc., of the CT Page 5261-SSSSSSSS site." (Internal quotation marks omitted.) Whisper WindDevelopment Corporation v. Planning Zoning Commission, supra,32 Conn. App. 519.
"The zoning commission has no discretion to deny the special exception if the regulations and statutes are satisfied" Felsmanv. Zoning Commission, 31 Conn. App. 674, 678, 626 A.2d 825
(1993). Further, "[t]he trial court ha[s] to decide whether the board correctly interpreted the section of the regulations and applied it with reasonable discretion to the facts." (Brackets omitted.) Double I Limited Partnership v. Planning ZoningCommission, supra, 218 Conn. 72.
On June 2, 1987, through its eminent domain power, CRRA condemned and took from TLA the real property upon which CRRA now has its transfer station. (ROR, Item 42.) Pursuant to the Certificate of Taking, filed June 2, 1987, the fee simple title to the property described in Exhibit A vested in CRRA. (ROR, Item 42.) Exhibit A describes the western boundary of CRRA's property, which abuts TLA's proposed facility site. (ROR, Item 42.) Exhibit A also expressly reserves to TLA "a full, perpetual and permanent right of way for all purposes for which a public highway might be used and a full, perpetual and permanent easement for the construction, installation, maintenance and repair of water and sewer lines and related facilities and other utilities over, under, upon, within and through" the easement which the City of Torrington had granted CRRA on May 19, 1987. (ROR, Item 42.) TLA's proposed facility site abuts the western boundary of CRRA's property, and TLA's only access to Dump Road and South Main Street is over a right of way over CRRA's easement. (ROR, Item 42; ROR, Item 51.)
TLA's proposed facility site is located in the Industrial Zone. (ROR, Item 51: Plans entitled "Torrington Land Associates, Inc. Leaf Composting and Transfer Station Special Exception and Site Plan Application" prepared by Anchor Engineering Services, Inc., 287 Main Street, East Hartford, CT dated January 27, 1995; revised March 7, 1995; Transcript of July 12, 1995 Public Hearing, p. 49.) Zoning Regulations § 4.13 provides the area and setback requirements for the Industrial Zone. Specifically, Zoning Regulations § 4.13 requires a lot width of eighty feet (80').
Although, based on the maps provided with TLA's Leaf Composting and Transfer Station Special Exception and Site Plan CT Page 5261-TTTTTTTT Application, as prepared by Mark Zessin of Anchor Engineering Services, TLA's proposed facility site will have a lot width in excess of the required eighty feet, this lot width is not "on a City accepted street." (ROR, Item 51; see Zoning Regulations § 2.2.) Further, the right of way, which CRRA granted to TLA, is a right of way over an easement, which CRRA received from the City of Torrington. (ROR, Item 42.) This easement constitutes an accessway. (ROR, Item 42; Zoning Regulations § 2.2). Therefore, TLA's proposed Facility site constitutes a flag lot.
Zoning Regulations § 1.5.1 provides that "[n]o land shall be used, and no building or structure shall be erected, altered, moved, used or occupied except in conformance with these regulations." Id. As a flag lot, TLA's proposed facility site does not conform with the Zoning Regulations.
Meanwhile, the Zoning Regulations only make one provision for the use of a flag lot. Zoning Regulations § 5.7 provides that "[i]n R-15, R-15s, R-25, R-40, R-60 and R-WP zoning districts, the Planning and Zoning Commission may approve as part of a subdivision, or by special exception when no subdivision is required, the use of an accessway to serve a lot which does not comply with the minimum lot width requirements provided all the following conditions are met." In Zoning regulations § 5.7.1 through § 5.7.17, the City of Torrington set forth these conditions. Therefore, because TLA's proposed facility site is zoned Industrial, the PZ does not have the authority, pursuant to Zoning Regulations § 5.7, to approve, by special exception, when no subdivision is required, the use of an accessway to serve a lot which does not comply with the minimum lot width requirements.
When ruling on a special exception, the PZ's function is to determine whether the applicant's proposed use is expressly permitted under the regulations, and whether the standards set forth in the regulations and the statutes are satisfied. SeeWhisper Wind Development Corporation v. Planning and ZoningCommission, supra, 32 Conn. App. 520. The Zoning Regulations do not provide for TLA's use of its proposed facility site because it is a flag lot in the Industrial Zone. Thus, because TLA's proposed facility site use was not expressly permitted under the Zoning Regulations, the PZ acted arbitrarily and capriciously when it granted TLA's special exception application. Accordingly, the court sustains CRRA's appeal on this ground. CT Page 5261-UUUUUUUU
CRRA also appeals based on two additional grounds. Although the above issue is dispositive in sustaining CRRA's appeal, these two additional grounds raised by CRRA will also be addressed for the court.
Whether TLA's Proposed Facility Would Hamper the City ofTorrington's Traffic Circulation Pursuant to § 8.2.2 of theZoning Regulations.
CRRA argues that the PZ failed to enforce Zoning Regulations § 8.2.2. Specifically, CRRA argues that "the traffic study submitted by CRRA and testimony by its traffic expert shows that the proposed use under the [special exception] Application will increase traffic volume such that a traffic hazard will be created, and will hamper the City's traffic circulation." Further, CRRA argues that "the [Zoning] Regulations specifically require that, in order to grant a special exception, the [Planning and Zoning] Commission must make a finding that no traffic problems would be created or aggravated," and that the PZ's "record is devoid of any such finding. . . ."
The PZ maintains that whether TLA's proposed facility would create or aggravate the City's traffic circulation constitutes a question of fact for the PZ to decide. Further, the PZ argues that, based upon the evidence and the return of record, it "rightly decided that TLA's proposed, facility would not hamper the City's traffic circulation," nor would it create or aggravate a traffic hazard.
TLA argues that through David Spear, principal engineer with DLS Consulting Traffic Engineering Services, TLA provided the PZ with a detailed and extensive traffic study, as well as testimony, documenting that granting TLA's special exception application would not create a traffic hazard, nor hamper the City's traffic circulation.
Zoning Regulations § 8.2.2 provides that "[i]n addition to any conditions found elsewhere in these regulations, the Commission shall grant a special exception only if the Commission finds that the proposed special exception will not: A. create or aggravate a traffic, fire or other safety hazard; B. hamper the City's traffic circulation; C. be detrimental to the long term protection of a public water supply watershed." Zoning Regulations § 8.2.2. CT Page 5261-VVVVVVVV
The PZ did not make a finding regarding the impact TLA's proposed facility would have on the City's traffic circulation. If a planning and zoning commission fails to state clearly the reasons for its decision, the trial court must search the record to find a basis for the commission's decision. Double I LimitedPartnership v. Plan. Zoning Commission, supra, 218 Conn. 73. Therefore, because the PZ failed to find specifically that TLA's proposed special exception would not: "A. create or aggravate a traffic, fire or other safety hazard; B. hamper the City's traffic circulation; C. be detrimental to the long term protection of a public water supply watershed," this court must search the record to find a basis for the PZ's decision.
"A zoning board, like any other administrative board or agency, may determine for itself the weight it will give to the evidence it receives in the form of oral testimony or any materials or statistical data that are presented on any particular issue . . . and, although it may have heard evidence to the contrary, it is not required to explain why it valued one witness or statistic over another." (Citation omitted.) Brennickv. Planning Zoning Commission, 41 Conn. Sup. 593, 602,597 A.2d 346 (1991).
TLA submitted with its special exception application a traffic study, dated April 19, 1995, and prepared by DLS Consulting or Windsor, CT. (ROR, Item 49: Traffic study dated April 19, 1995 submitted by TLA with its application.) At the June 14, 1995 Public Hearing, David Spear of DLS Consulting provided a brief overview of the traffic study he prepared. (June 14, 1995 Public Hearing Transcript, pp. 9-13.)
David Spear testified that "[o]ur study consisted of primarily a focus of the site access where the existing Dump Road comes into the CRRA driveway and also where Old Dump Road comes into South Main Street." (June 4, 1995 Public hearing Transcript, p. 9.) He also testified that "[o]nce we developed the [traffic] volumes, we did capacity analyses at the two existing intersections which one veers off the map and the other is Old Dump Road at South Main Street. And in the future case, we analyzed the new drive at the CRRA drive and again the same intersection with Old Dump Road and South Main Street. That analysis showed that we had a level service B or better operation before and after you add the site traffic. And there were no significant change[s] with the addition of site traffic. The other areas we looked at as far as safety goes, we did review the CT Page 5261-WWWWWWWW accident history for the area. Particularly, we looked at South Main Street within five hundred feet on either side of Old Dump road, and no accidents were reported to the state in the latest three year accident history for that area. We also reviewed the sight lines and we found that acceptable sight lines would be available at the new intersection and that there are also acceptable sight lines where Old Dump Road enters South Main Street." (June 14, 1995 Public Hearing Transcript, pp. 11-12.)
When ruling on a special exception, the PZ's function is to determine whether the applicant's proposed use is expressly permitted under the regulations, and whether the standards set forth in the regulations and the statutes are satisfied. SeeWhisper Wind Development Corporation v. Planning and ZoningCommission, supra, 32 Conn. App. 520. "The zoning commission has no discretion to deny the special exception if the regulations and statutes are satisfied." Felsman v. Zoning Commission, supra,31 Conn. App. 678. There is a substantial basis on the record for the PZ's decision that the proposed facility complies with Zoning Regulations § 8.2.2's requirements regarding traffic circulation; the court therefore denies CRRA's appeal on this ground.
Whether Leaf Composting is Akin to Manufacturing or Processing ofGoods, and Therefore Does Not Require a Special Exception in theIndustrial Zone.
CRRA argues that TLA is not permitted, as a matter of right, under the Zoning Regulations to have a leaf composting facility in the Industrial Zone. Further, CRRA argues that "leaf composting is not permitted specifically under the [Zoning] Regulations, nor is it listed or described as the `processing of material goods' under the [Zoning] Regulations." Rather, CRRA argues that TLA should have applied for a special exception under the Zoning Regulations as a "recycling center."
Despite CRRA's argument that leaf composting is not allowed as a matter of right in the Industrial Zone, the PZ argues that it correctly determined that leaf composting is akin to manufacturing or processing of goods, and therefore does not require a special exception in the Industrial Zone. Although the PZ acknowledges that the Zoning Regulations do not specifically mention leaf composting, TLA does not need a special exception for leaf composting because "it would be impossible for regulations to mention each and every possible use. The regulations therefore CT Page 5261-XXXXXXXX must be interpreted so that like uses are treated the same." (PZ's Brief, p. 8.)
TLA argues that leaf composting is permitted, as a matter of right, in the Industrial Zone, pursuant to Zoning Regulations § 3.1 Table of Uses § 19.0. TLA also argues that the PZ's record clearly documents the PZ's finding that leaf composting constitutes manufacturing or processing, permitted in the Industrial Zone, as a matter or right, under the Zoning Regulations.
Zoning Regulations § 3.1 provides that "Table 1 of this section is part of these regulations. Land and structures shall be used for one or more of the uses specified in Table 1. Any use not specified is prohibited." Section 19 of Table 1 permits, as of right, "Manufacturing, Processing, Creating, Repairing, Renovating, Painting, Cleaning or Assembling of Goods, Merchandise or Equipment," in the Industrial Zone. Section 11 of Table 1 permits, by special exception, "Junk Yards, Scrap Materials Salvage Yards, Recycling Centers Automobile Graveyards," in the Industrial Zone. Zoning Regulations § 2, which is the definition section, only defines "Junk Yard." Zoning Regulations § 2 does not define the other terms in §§ 11 and 19 of Table 1.
Consequently, because "[a]ny use not specified [in Table 1] is prohibited," the PZ had to determine whether TLA's proposed leaf composting facility fit within one of the uses listed in Table 1. Specifically, the PZ had to determine whether § 11 of Table 1 or § 19 of Table 1 more aptly government TLA's proposed leaf composting facility.
"It is well settled that courts are not to substitute their judgment for that of the board, and that the decisions of local boards will not be disturbed as long as honest judgment has been reasonably and fairly made after a full hearing . . . as the credibility of witnesses and the determination of factual issues are matters within the province of the administrative agency. . . . The court's function is to determine on the basis of the record whether substantial evidence has been presented to the board to support its findings." (Citations omitted.) MobilOil Corp. v. Zoning Board of Appeals, supra, 35 Conn. App. 209-10.
At the June 28, 1995 Public Hearing on this matter, Scott Atkin, an environmental engineer with Anchor Engineering CT Page 5261-YYYYYYYY Services, testified as to how TLA intends to operate its leaf composting facility. (June 28, 1995 Public Hearing Transcript, pp. 21-48.) With his presentation, Mr. Atkin submitted the "State of Connecticut Adopted Solid Waste Management Plan," and Leaf Composting: A Guide for Municipalities." (ROR, Item 30: State of Connecticut Adopted Solid Waste Management Plan dated February 1991 submitted to Planning Zoning Commission at June 28, 1995 Public Hearing on TLA's application; and ROR, Item 31: Manual entitled "Leaf Composting: A Guide for Municipalities" dated January 1989 submitted to Planning Zoning Commission at June 28, 1995 Public Hearing on TLA's application.) Mr. Atkin testified that composting "just makes good sense. You take a product, you take a waste basically, you treat it, you add water to it, keep the oxygen levels up. A year later, you have something that you can use again." (June 28, 1995 Public Hearing Transcript, p. 23.)
In response to Mr. Atkin's presentation and testimony, the PZ had numerous questions for Mr. Atkin and Mr. Michael Botticello, the President of TLA. Specifically, one of the members of the PZ asked Mr. Botticello that if "I need compost for my garden. I go down there [to TLA's facility] to buy compost. Are you going to charge me for that . . . ?" (June 28, 1995 Public hearing Transcript, p. 44.) Mr. Botticello responded "[i]n theory, yes, the materials go out there would be a charge on it." (June 28, 1995 Public hearing Transcript, p. 44.) At this point, the PZ asked Mr. Botticello if he expected to make a profit from the leaf compost, like any manufacturer. (June 28, 1995 Public hearing Transcript, p. 44-45.) Mr. Botticello responded that he intended to make a profit just like any manufacturer. (June 28, 1995 Public hearing Transcript, p. 45.)
Additionally, Mr. Herbst, TLA's attorney, argued at the June 28, 1995 public hearing that "one of the issues that was raised last time was whether what we are doing constitutes manufacturing or processing . . . I know that what we are doing is processing. We are taking raw materials, we are taking leaves, we are processing them, creating a new product which is compost and we are selling it. We are adding value to the leaves and selling it, and as my client Mike [Botticello, TLA's President] has indicated, he does expect to make money when he sells the compost." (June 28, 1995 Public hearing Transcript, p. 47.) Mr. Herbst also argued that "[f]or the record, and I will submit this[,] Black's Law Dictionary defines manufacture as anything made from raw materials by the hand, by machinery or by art. We CT Page 5261-ZZZZZZZZ are making compost from raw materials and we are doing it with machinery, also by hand." (June 28, 1995 Public hearing Transcript, p. 47.)
Further, in Leaf Composting: A Guide for Municipalities, the Connecticut Department of Environmental Protection (DEP) states that "[c]omposting is a biological process in which micro-organisms breakdown organic materials, like leaves, into a soil-like product called compost." (Emphasis added.) (ROR, Item 31, p. 8.)
Consequently, substantial evidence exists supporting the PZ's determination that leaf composting is akin to manufacturing or processing of goods, and is permitted as a matter of right in the Industrial Zone. Therefore, the court denies CRRA's appeal on this ground.
CONCLUSION
The court sustains CRRA's appeal on the ground that the PZ improperly granted TLA's special exception application because the Zoning Regulations do not provide for the use of a flag lot in the Industrial Zone.
RICHARD A. WALSH, J.